## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **EDEN CASTLEBERRY COOK**, *individually and on behalf and as next of friend of her minor son,* **W.J.** | : : : : | **Case No:** |
| PLAINTIFFS, | : : | **Judge:** |
| -v.- | : : : |
| **INDIAN HILL EXEMPTED VILLAGE SCHOOL DISTRICT** 6855 Drake Road Cincinnati, Ohio 45243 | : : : : : |
| and, | : : |
| **BOARD OF EDUCATION OF THE INDIAN HILL EXEMPTED VILLAGE SCHOOL DISTRICT** 6855 Drake Road Cincinnati, Ohio 45243 | : : : : : : |
| and, | : : |
| **KIRK KOENNECKE** *(In official and individual capacities)* 6855 Drake Road Cincinnati, Ohio 45243 | : : : : : |
| and, | : : |
| **JIM NICHOLS** *(In official and individual capacities)* 6855 Drake Road Cincinnati, Ohio 45243 | : : : : : |
| and, | : : |
| **WHITNEY BUELL** *(In official and individual capacities)* 6855 Drake Road Cincinnati, Ohio 45243 | : : : : |

1

and,                                    :
                                        :
**NATE EIGHER**                         :
*(In official and individual capacities)*   :
6855 Drake Road                         :
Cincinnati, Ohio 45243                  :
                                        :
and,                                    :
                                        :
**COURTNEY STRITTMATTER**               :
*(In official and individual capacities)*   :
6855 Drake Road                         :
Cincinnati, Ohio 45243                  :
                                        :
and,                                    :
                                        :
**JONATHAN HOLLIS**                     :
*(In official and individual capacities)*   :
6855 Drake Road                         :
Cincinnati, Ohio 45243                  :
                                        :
and,                                    :
                                        :
**JANE DOE**                            :
*(In official and individual capacities)*   :
6855 Drake Road                         :
Cincinnati, Ohio 45243                  :
                                        :
and,                                    :
                                        :
**TERRAH M. KOCHER**                    :
405 Miami Ave.,                         :
Terrace Park, OH 45174                  :
                                        :
and,                                    :
                                        :
**INDIAN HILL FOOTBALL CLUB**           :
c/o Andy Roeder                         :
7804 Concord Hills                      :
Cincinnati, Ohio 452443                 :
                                        :
and,                                    :

| | |
|---|---|
| **SEAN MCCHESNEY** | : |
| 6813 Dearwester Dr., | : |
| Cincinnati, OH 45236 | : |
| | : |
| and, | : |
| | : |
| **CHRISTOPHER N. BORTZ** | : |
| 9005 Given Rd., | : |
| Cincinnati, Ohio 45243 | : |
| | : |
| and, | : |
| | : |
| **BRIAN CURRIN** | : |
| 5614 Oakvista Dr., | : |
| Cincinnati, OH 45227 | : |
| | : |
| and, | : |
| | : |
| **MINOR 1, MINOR 2, MINOR 3,** | : |
| **MINOR 4, MINOR 5, MINOR 6,** and, | : |
| **MINOR 7** | : |
| (*Minor Defendants to be identified under* | : |
| *seal*) | : |
| | : |
| DEFENDANTS. | : |

## VERIFIED COMPLAINT

Plaintiffs Eden Castleberry Cook and her minor son W.J. bring this action against

Defendants and state the following:

## **INTRODUCTION**

1. This case concerns a pattern of racial harassment, violence, and deliberate indifference by the Indian Hill Exempted Village School District and its officials. It concerns a nine-year-old Black child, W.J., who reported repeated racial slurs, threats, and physical attacks by a group of white students. Rather than protect him, the District ignored clear warnings, dismissed serious violence as ordinary behavior, and left him exposed to further harm.

2. In the fall of 2024, District officials were told that several white students repeatedly called W.J. "monkey" during youth football activities linked with the school. Two of the children were the sons of coaches. The District responded with symbolic gestures instead of action. No discipline was imposed. No safety measures were taken. This refusal to address early racial targeting set the stage for greater future harm.

3. In September 2025, after football practice, two white students carried out a coordinated assault on W.J. One child slammed W.J.'s head into the ground six to twelve times while another child strangled him. The District was notified the next morning. W.J.'s mother begged for continued vigilance. Instead of protecting W.J., Principal Whitney Buell told his mother that the school would do nothing. No warnings were issued to staff. No supervision was increased. No consequences were imposed on the aggressors. The District's refusal to act allowed the danger to grow.

4. On October 28, 2025, a group of children who included some of the same boys involved in earlier incidents, along with others who joined them, surrounded W.J., restrained him, and beat him during recess in a hate motivated group attack. They punched him, kicked him, and slammed his head into the ground. They stomped his head. They used racial slurs while doing so calling him "n****r." No adult intervened.

5. After the attack, W.J. sought help from several educators. Each failed to provide care. He was not taken to the nurse. He was not medically evaluated. He was placed alone in a room and left without support or protection. His mother was not told for hours. Medical professionals later confirmed that he had suffered a concussion, rib injuries, wrist injury, and significant trauma.

6. Despite repeated notice, the District allowed the aggressors to remain around W.J. without restriction. It declined to impose meaningful discipline. It declined to create a safety plan. It declined to investigate whether the violence was connected to the earlier racial harassment.

7. When W.J.'s mother asked the District to press charges, the District responded by issuing a no contact order meant to silence her and deter further complaints.

8. These events were not isolated. They were the predictable result of a system that refused to address racial harassment, ignored clear threats, denied care to an injured child, and retaliated against the parent who sought help. The District's failures violated the Constitution and federal and state law. W.J. continues to suffer serious emotional harm. His mother has been harassed, silenced, and punished for advocating for his safety.

9. This action seeks accountability, justice, and the protection of a child who was denied the basic right to safety at school.

## **PARTIES**

10. Plaintiff Eden Castleberry Cook is an adult resident of Hamilton County, Ohio. She brings this action on her own behalf and on behalf of her minor son, W.J., who was nine years old and a fourth-grade student at Indian Hill Elementary School during the events described in this Complaint.

11. Plaintiff W.J. is a minor child and appears through his mother and legal guardian, Plaintiff Eden Castleberry Cook.

12. Defendant Indian Hill Exempted Village School District ("District") is a public school district located at 6855 Drake Road, Cincinnati, Ohio 45243. The District is responsible for student safety, discipline, supervision, reporting obligations, and compliance with federal and state civil rights laws.

13. Defendant Board of Education of the Indian Hill Exempted Village School District ("Board of Education") governs the District. It sets policy, controls programs, oversees school operations, and is responsible for training, supervision, and the enforcement of all anti-harassment and safety procedures.

14. Defendant Kirk Koennecke ("Superintendent" or "Koennecke") is the Superintendent of the District. He is sued in his official and individual capacities. He exercised final supervisory and disciplinary authority over Indian Hill Elementary School and its staff.

15. Defendant Jim Nichols ("Nichols") is the Chief Human Resources and Operations Officer for the District. He is sued in his official and individual capacities. He participated in the handling and investigation of the September and October incidents and had authority to act for the District.

16. Defendant Whitney Buell ("Buell") is the Principal of Indian Hill Elementary School. She is sued in her official and individual capacities. She was responsible for student supervision, discipline, mandatory reporting, and the response to bullying and racial harassment.

17. Defendant Nate Eigher ("Eigher") is the Assistant Principal of Indian Hill Elementary School. He is sued in his official and individual capacities. He participated in the response to the October 28 assault and had responsibility for recess supervision and safety.

18. Defendant Courtney Strittmatter ("Strittmatter") is a staff member at Indian Hill Elementary School. She is sued in her official and individual capacities. She participated in the school response to the events involving W.J.

19. Defendant Jonathan Hollis ("Hollis") is a staff member at Indian Hill Elementary School. He is sued in his official and individual capacities for his role in student supervision and safety.

20. Defendant Jane Doe is a behavior specialist at Indian Hill Elementary School who received W.J.'s report of the October 28 attack and failed to act, failed to report, and failed to protect him. She is sued in her official and individual capacities. Her true identifying information will be substituted when known.

21. Defendant Terrah Kocher is the parent of a minor student involved in the assaults. She personally confronted and approached W.J. at Indian Hill school events.

22. Defendant Indian Hill Football Club ("IHFC") is a youth football program that used the Indian Hill School District name, mascot, and school branding. The program mirrored school functions, operated on school property, and ran in coordination with District events such as pep rallies, homecoming activities, and student assemblies. The Football Club is significantly intertwined with the District and the Board.

23. Defendant Sean McChesney is the President of the Indian Hill Football Club. He had authority over program operations and had notice of the September 18 assault and failed to act.

24. Defendant Christopher N. Bortz is a football coach for the Indian Hill Football Club. He witnessed the September 18 attack and failed to protect W.J. He also failed to discipline involved students and failed to act in response to the known racially motivated bullying and harassment of W.J.

25. Defendant Brian Currin is an assistant coach for the Indian Hill Football Club. He had responsibility for student supervision during football activities and also failed to act in response to known racial harassment and the September 18 assault.

26. Defendants Minor 1 through Minor 7 are minor students who physically attacked, threatened, or participated in the assaults on W.J. They are sued as Minor Defendants. Their true names will be identified under seal. (Appendix 1).

## **JURISDICTION AND VENUE**

27. This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, 42 U.S.C. § 1988, and Title VI of the Civil Rights Act of 1964.

28. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because these claims arise from the same facts and form part of the same case or controversy under Article Three of the United States Constitution.

29. The Court has personal jurisdiction over all Defendants because they reside in Ohio, work in Ohio, operate in Ohio, or committed acts in Ohio that give rise to this action.

30. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Hamilton County, Ohio.

## FACTUAL ALLEGATIONS

31. This case is about a preventable cycle of racial harassment, escalating violence, and institutional inaction that placed a nine-year-old Black child in danger. For more than a year, the Indian Hill Exempted Village School District received repeated warnings that W.J. was being targeted because of his race. Each warning gave the District another chance to protect him. Each time the District failed. What happened to W.J. on October 28, 2025, was not a moment of confusion or a playground misunderstanding. It was the predictable and preventable result of a long pattern of ignoring racism, ignoring violence, and ignoring the pleas of a mother trying to keep her child alive.

### A. The First Signs of Racial Hostility Were Clear and Ignored

32. In the fall of 2024, W.J. was subjected to repeated racial harassment. Three white children  two of whom were the sons of Indian Hill Football coaches, repeatedly called him "monkey." The slur was not ambiguous. It was not isolated. It was not misunderstood playground talk. It was a targeted and degrading racial insult directed at a nine-year-old Black child. MINOR 1 was on of the children calling W.J. "monkey."

33. The harassment was reported by his mother, Eden, to then Principal Cash Hayden. She made the District aware that the hostility was racial, that it was directed specifically at her son, and that it was repeated.

34. The District's response showed a pattern that would later prove devastating. Instead of disciplining the aggressors or documenting the offense as a Title VI incident, the District arranged only a symbolic presentation by a speaker who talked to children about "differences." It is unknown if this was even related. There was no discipline. There was no mandatory parent notification. There was no written report. There was no follow up. There was no monitoring plan for the aggressors. There was no safety plan for W.J.

35. The District had policies that required it to document the incident, investigate, intervene, and discipline. Instead, it filed the matter away as if it did not matter. Had the District followed its own written rules, it would have done the following:

    a.  Interview every child involved and gather statements.

    b.  Document findings in writing as required by Board Policies. (Exhibit A).

    c.  Notify the custodial parents of the aggressors.

    d.  Create an intervention or behavior plan for the aggressors.

    e.  Provide racial harassment education to the aggressors.

    f.  Alert recess staff, teachers, and counselors to monitor for further misconduct.

    g.  Refer the matter to the District Title VI Coordinator for tracking and compliance.

    h.  Place W.J. on a protective supervision list to ensure safe transitions and monitored unstructured time.

36. The District did none of these things.

37. That silence taught the aggressors that racial harassment had no consequence.

38. It taught the victim that reporting did not matter.

39. This failure became the foundation for everything that followed.

**B. The Indian Hill Football Club Operated as a State Actor When It Chose to Look Away**

40. The Indian Hill Football Club did not function like a private program. Every aspect of it was intertwined with the District.

41. The Club used the Indian Hill school name, mascot, colors, and branding.

42. Enrollment occurred through the same online system families used for academic registration.

43. The players were all Indian Hill students.

44. The Club operated during school sponsored pep rallies, homecoming events, and assemblies.

45. Families believed the program was school sponsored because it functioned exactly like a school team. District administrators treated it as a school operation when convenient. Yet when violence occurred, the District attempted to disclaim responsibility and suddenly insisted it was independent.

46. Because IHFC operated on school property, under school authority, and under the apparent authority of District coaches and staff, it acted under color of state law. Every failure by its leadership is attributable to the District that enabled it.

### C. The September 18 Assault Was Predictable, Racially Infused, and Preventable

47. On September 18, 2025, the racial hostility that had been ignored the prior year exploded into violence.

48. W.J. is the only black player on the football team.

49. After football practice ended, MINOR 2 and MINOR 8, both white fourth graders, carried out a coordinated ambush on W.J. while Coach Bortz and MINOR 1 stood nearby.

50. After practice, W.J. casually threw a ball. Without warning, MINOR 2 charged at full speed and slammed him to the ground. While W.J. lay dazed and unprotected, MINOR 8 seized his head with both hands and repeatedly smashed his skull into the ground up to a dozen times.

51. At the same moment, MINOR 2 placed both hands around W.J.'s neck and strangled him while he was pinned on the ground.

52. W.J. wore no helmet. The risk of brain injury, spinal trauma, and death was obvious. This was not horseplay. It was a violent assault during a school affiliated activity, with children who are in class with W.J., involving children with a known history of racial misconduct toward the same victim.

**D. The District Response Was Dismissal Rather Than Protection**

53. The next morning, September 19, Eden did what the law and common sense both expect of parents. She notified school leadership. She called Principal Whitney Buell and gave a clear, detailed account of what happened. She reported that her son had been slammed to the ground, that his head had been smashed into the earth repeatedly, that another student had choked him while he was down, that he had injuries, and that she feared he could have a concussion or internal damage. She explained that the aggressors were classmates. She reminded the school that racial hostility had been present with the same group. She asked the administration to protect her son during the school day and to take the assault seriously.

54. This was a moment when the District had a choice. It could apply its policies, treat the report as a serious act of violence connected to prior racial harassment, and mobilize the tools it had created on paper to keep children safe.

55. Instead, Principal Buell told her that because the attack took place "after practice" the school would not act and was not responsible.

56. At that point the District could and should have taken a series of basic, mandatory steps.

57. It could have opened a bullying and harassment file.

12

58. It could have completed a written incident report as required by Policy 5517.01.

59. It could have documented that W.J. had been assaulted by peers who already had a racial history.

60. It could have notified the District's civil rights or Title VI coordinator that a Black student had been targeted on a school connected field after prior racial slurs.

61. It could have notified all W.J.'s teachers and recess monitors that he was at elevated risk and that specific students should not be allowed free unsupervised contact with him.

62. The school could have convened a threat assessment or safety team to evaluate the risk of future harm.

63. The school could have recommended no contact conditions between the aggressors and W.J. during the school day.

64. It could have ordered closer supervision of high-risk locations like recess fields and lunch areas.

65. It could have called the parents of MINOR 2 and MINOR 8 to inform them of the seriousness of the assault and to impose corrective measures.

66. It could have reported the assault to the school resource officer or to law enforcement for further investigation.

67. Instead, the District chose to do none of these things. It did not open an investigation. It did not document. It did not warn staff. It did not implement a safety plan. It did not increase supervision. It did not call the Title VI coordinator. It did not call the police. It did not treat this as a violent act with racial roots.

68. The result was that the same group of children remained free to approach, threaten, and harm W.J. during the school day with no meaningful adult intervention. The District's refusal to act after the September 18 assault signaled to everyone involved that even a violent head slamming and choking of a Black child would not move the system to protect him.

### E. Coaches Responded to a Violent Assault with Excuses Rather Than Action

69. After the September 18 attack, the adults involved in the Indian Hill Football Club had an opportunity to intervene. They had the chance to set boundaries, protect a child in their care, and impose discipline that would deter future harm. Instead, they minimized what happened and allowed the aggressors to continue without consequence.

70. Both head and assistant coaches were aware of the assault. One of them had personally witnessed it. None of the adults responsible for the team suspended any player. None removed a single aggressor from games or practices. The environment W.J. had been harmed in was left unchanged.

71. When Eden approached the coaches, they told her they would "handle it," but not a single meaningful action followed those words.

72. The day after the first attack, at a school connected homecoming event, an attacker who had slammed W.J.'s head into the ground was allowed to participate fully, without restriction. He was celebrated and included. W.J., the child who had been choked and battered, saw that nothing had changed.

73. When Eden sought help from the President of the Indian Hill Football Club, she was met with another wall. The leader of the program, who had authority over operations and the adults involved, acknowledged the seriousness of the attack but then

claimed he could do nothing. He pushed responsibility back down the chain of command, onto coaches who had already refused to act. The program washed its hands of the assault.

74. Because of this failure to act, Eden removed W.J. from the football team for his protection.

75. Then, on October 3, one of the coaches sent a mass email to the team's families. The email characterized the violent head slamming, choking, and ambush as mere "scuffles." It assured recipients that the actions did not "warrant[] removal" and that the actions "were [not] criminal," that "appropriate discipline was applied," and that "winners do not quit." (Exhibit C).

76. Every key claim in the email was false. There had been no discipline. There had been no meaningful action.

### F. A Parent of an Aggressor, Escalated the Harm by Intimidating and Cornering W.J.

77. After the assault, the danger to W.J. did not come only from the players who had attacked him.

78. It came from the parent of MINOR 2.

79. Instead of offering concern for the child who had been harmed, this adult confronted W.J. in ways that amplified his trauma and created new risk. The verbal confrontations took place not once but twice.

80. The first confrontation occurred at a school event the day after the assault. W.J. was standing alone. He was nine years old. An adult walked straight up to him, stepped into his personal space, and spoke to him with authority as if he had done something wrong. She told him to stand there and listen while she explained why her son had attacked him. After that, she told this injured nine-year-old child to apologize to the boy

15

who had slammed his head into the ground the day before. This was not guidance. This was intimidation by an adult directed at a frightened child.

81. This interaction was not a misunderstanding. It was an adult using her size, age, and authority to pressure a traumatized child. The conduct was intimidating and emotionally harmful.

82. After another football practice, the same adult confronted him again. W.J. was walking quietly with his cousin. She suddenly stepped into his path and blocked him so he could not move forward. She stood over him and used a sharp and hostile tone. She accused him of tackling her son "too hard" during a normal practice play. She claimed that his routine football action was retaliation for the violent assault her own son had helped carry out. She placed blame on a frightened child who had already been hurt and who was doing nothing more than trying to walk away. Her conduct was intimidating, aggressive, and inappropriate for any adult, let alone an adult who knew he had been beaten only days earlier. Her actions increased his fear and shame and made him feel trapped, powerless, and unsafe. She simply wanted to harass and intimidate him. She accomplished this goal.

## G. On October 2, in a Meeting Meant to Seek Safety, the District Announced It Would Do Nothing

83. By early October, Eden had exhausted the informal routes. She asked for a meeting with school administrators to address the escalating danger to her son. On October 2, she and her sister met Principal Whitney Buell and Assistant Principal Nate Eigher.

84. Instead of acknowledging the seriousness of the September attack, the administrators repeated that the school "could not" discipline the aggressors. They stated that because the attack occurred "after practice," they had no ability or intention to act.

85. They insisted that violence involving District children did not fall under their responsibility. This claim was factually incorrect. The school had full authority over student interactions during the day, including recess, classroom transitions, shared spaces, and peer contact. It could impose no contact restrictions. It could increase supervision. It could warn recess monitors and teachers. It could implement a safety plan. It could flag the students involved for closer monitoring.

86. **During this meeting, Eden asked for a single, modest, and basic protection. She asked for continued vigilance. She asked staff to watch for danger, to be alert, and to intervene if needed.**

87. The administrators told her that no consequences would be issued and no concrete actions would be taken. The District had now been warned about racial slurs in 2024, had been warned about the September 18 assault, had been warned about adult intimidation, and had been warned again on October 2. Each time it had a chance to intervene. And each time it chose not to.

### H. The District was Warned Repeatedly, But Its Failure to Act Led Directly to A Racial and Violent Group Attack

88. On October 28, 2025, the danger that Eden had warned about for weeks exploded into reality.

89. During lunch, MINOR 3 approached W.J. and taunted him. He asked him several times, "Are you really ready for recess?" He asked it with a tone that made clear this was not a casual question. It was a warning, a signal, a declaration that something was about to happen once they got outside.

90. This happened in a crowded cafeteria, in front of adults, at a time of day when teachers and aides were tasked with supervision. The repetition of the question, the tone, and the context were obvious. It was an intimidation tactic. It was also a final chance for the school to prevent what came next. But no staff member intervened, no one asked questions, and no one redirected or separated students.

91. In a school committed to safety, a threat made in a cafeteria would trigger action. Staff could have separated the children. They could have monitored their movements. They could have increased supervision of the playground. Instead, the staff did nothing, and the prelude to the attack went unchecked.

## I. On the Playground, a Coordinated Attack Exploded in Seconds and No Adult Intervened

92. Only minutes after the cafeteria threat, the violence began on a playground filled with over 100 children and only four supervising adults. Supervision was stretched thin even on a normal day, and staff had been warned specifically that W.J. was in danger. Yet no adjustments were made.

93. When recess began, multiple white students (MINOR 1, MINOR 3, MINOR 4, MINOR 5, MINOR 6, and MINOR 7) surrounded W.J. Some of these boys had been involved in the earlier hostility, and others were part of the same peer group that had targeted him before. Several were football players.

94. They did not attack at random. They moved as a group, following him and closing in around him. One of them yelled, "Catch him." W.J. attempted to run. He tried to escape. But he had no protection, no adult nearby, and no route to safety. The boys closed the distance in seconds. They caught him.

95. At least one held W.J.'s arms behind his back, restraining him so the others could strike him repeatedly. He was hit in the face, kicked in the stomach, kicked in the ribs, and punched from multiple directions.

96. This did not happen in a corner or behind a structure. It happened in plain view of staff assigned to recess. Yet no adult intervened, despite visible pursuit, shouting, physical restraint, and repeated blows.

97. W.J. believes at least one adult saw this attack but did not intervene.

98. This could not have happened in a properly supervised environment. The level of violence, speed, and coordination (combined with staff inaction) shows a failure that goes beyond negligence. It shows deliberate disregard for warnings and basic safety.

99. In a moment of fear and desperation, W.J. used every bit of strength he had and tore himself free from the hold. He ran. He ran as fast as he could. He ran toward the jungle gym area, the only structure on the playground where he thought he might be able to climb or duck behind something long enough to get away from the boys who had attacked him. He believed that if he could reach the structure he might be able to escape or be seen by an adult.

**J.  The Attack Turned Racial**

100. The children moved as a pack. They caught up to W.J. at the jungle gym. There was no safe exit. There was no adult stepping forward. There was no intervention. The second round of the attack began.

101. At the jungle gym, MINOR 1 grabbed his arms again and forced them behind his back so that others could strike him.

102. MINOR 4 drop kicked him and stomped his head.

103. Others closed in around him, shouting, kicking, and hitting.

104. One minor took his shoe and threw it as part of the humiliation.

105. While held from behind with his arms forced back, W.J. was hit in the face, punched in the ribs, and kicked in the stomach. His head was stomped into the ground. In the middle of this, he heard racial slurs. He heard the word "f*****ing n****r" screamed at him while they struck him. Race was used as a weapon. The assault was driven by hostility toward his identity as a biracial Black child. Throughout the attack, racial slurs continued. The blows were not random. They were targeted. They were violent. They were meant to cause harm.

106. This was not a playground fight. This was a coordinated group beating that had multiple phases. It was a hate motivated assault that continued even after the victim tried to flee. It happened in plain view of school staff. It happened after weeks of warnings. It happened because the school failed to act when it should have. It was the exact scenario that Eden had described to staff earlier in the month when she asked for protection. She warned that the same group of boys who had previously attacked and racially harassed her son could do so again. The school dismissed the danger and failed to create any safety measures. The consequences were catastrophic.

107. By the time the second round ended, W.J. believed he would die. His later written statement confirms this fear. A nine-year-old child does not make such a statement lightly. He believed this because he had broken free and still could not escape. He believed this because he ran and still was hunted down. He believed this because adults watched from a distance and did not intervene to stop the violence.

108. The brutality of the second phase of the attack is important because it shows the complete failure of supervision. It shows that the initial attack could have been stopped sooner. It shows that once W.J. broke free and ran, even then no adult stepped

in. It shows that the school had no safety protocols, no rapid response, and no meaningful presence on the playground. It shows that the group believed they could continue without consequence because the school had taught them through months of inaction that nothing would be done.

**K. The Staff Response Was a Complete System Failure That Magnified W.J.'s Trauma**

109. After escaping the attack, W.J. did what a child in crisis is taught to do. He ran to the nearest adult (Courtney Strittmatter) and begged for help. He reported that he had been attacked. He sought safety. He sought care.

110. But instead of helping him (the black kid), the teacher dismissed him. She did not call for medical aid. She did not take him to the nurse. She did not remove him from danger. She did not comfort him.

111. Instead, she told him to apologize to the white kid who she believed was the victim. She made him apologize to MINOR 4 (the same minor who had just head stomped him). Therefore, forcing the victim to express remorse to the group that had just beaten him. This act alone created additional trauma. It taught W.J. that adults would not protect him, and that reporting harm would result in blame, not help.

112. The failure did not end there.

113. When W.J. returned to class, he told his teacher, Mr. Hollis, what happened. He was ignored. No medical check was made. No nurse was called. He was sent to stand in a hallway alone.

114. He then told behavior specialist Jane Doe. She also failed to act. No nurse. No administrator. No safety steps.

115. When Assistant Principal Nate Eigher finally spoke to W.J., the boy again explained that he had been beaten, restrained, and kicked. Even then, he was not sent to the nurse, not monitored for concussion, not separated from his attackers, and not protected. The assistant principal minimized what happened and took no safety steps.

116. When W.J. was sent to the school counselor, Ms. Kellett, he again described the violence. She also failed to send him to the nurse or ensure he received medical attention.

117. Instead of care, W.J. was placed in an isolation room. Alone. Injured. Afraid. He was hidden away in a room instead of evaluated for concussion or internal injuries. This was not only negligent. It was harmful.

**L. The School Never Called His Mother Until Hours Later, Leaving a Nine Year Old With a Concussion Alone With His Fear**

118. Despite injuries, repeated disclosures, and a violent attack captured on school cameras, the school did not call Eden for hours.

119. By the time she found out, W.J. had been forced to sit in class after a head trauma, left alone in isolation despite fear and pain, and placed within proximity of the same children who had beaten him minutes earlier. He was never examined by the school nurse. No report was made. No documentation was created. All procedures required by Board policies were ignored.

120. Every possible safeguard was abandoned. It was not simply that the school failed to act. The school acted in ways that made the harm worse.

121. This was a complete systematic failure.

    a. Mr. Hollis ignored him

    b. Jane Doe ignored him

    c.  Mr. Eigher ignored him

    d.  Ms. Kellett ignored him

    e.  Not one educator provided help

    f.  Not one educator notified the nurse

    g.  Not one educator contacted Eden

    h.  Not one educator removed the attackers

    i.  Not one educator initiated the District's Title Six obligations

    j.  No medical assessment took place

**M. A Hospital Confirmed Serious Injuries and Raised Questions About Why the School Provided No Care**

122. When Eden took W.J. to medical professionals, they immediately recognized the seriousness of the attack. He was examined by a primary care doctor and then at Cincinnati Children's Hospital. He was diagnosed with a concussion, bruised ribs, a bruised wrist, and significant emotional shock.

123. Physicians initially believed his spleen might be ruptured, a life threatening injury. And he was placed on a trauma table.

124. During this evaluation, a hospital social worker asked Eden why the school had not sent W.J. to the nurse. Eden explained that the school had told her that he had been taken to the nurse and that there were "no issues." Later that evening, after speaking with W.J. herself, Eden learned that he had never gone to the nurse at all. No medical check was done. No one examined him. The school's earlier claim was false, and it concealed the fact that a child who had been beaten, restrained, and hit in the head had received no medical care during the school day. The social worker informed Eden that she had the right to press charges.

**N. Instead of Protecting the Child or Supporting the Mother, the District Retaliated Within Hours**

125. On October 30, Eden sent a formal written request asking the District to press charges, describing the incident as a hate motivated group attack.

126. Hours later, the District issued a no contact order against her. (Exhibit B).

127. This was a punitive, retaliatory action issued with speed and hostility.

128. The timing was intentional. It was designed to silence her, intimidate her, and stop her from advocating for her child. It did nothing to protect students. It protected only the District from Eden's critical viewpoints.

129. That same day, she was told she "could not press charges," a statement directly contradicted by law and by the hospital social worker.

130. Rather than confront racial violence, the District chose to confront the mother who reported it. Because the District did not like her viewpoints.

131. Eden has never acted violently, threatened anyone, or disrupted a school meeting or event. There is no evidence that her presence at school board meetings or on school property creates any safety risk.

132. As a direct result of this indifference W.J. believes he is unsafe at school. W.J. wrote the following to the school:

> Dear Indian Hill Elementary,
>
> I don't feel safe going to school because people called the n-word and jumped me twice and you guys didn't do any thing about the all the people who jumped me and you guys want me to come back but even know you guys want me to come back I'm not. cause if I go back I feel like if they jump again I will die. when they held and restrained me you guys still did nothing about that and why do you guys let mrs. strimmater out there all she care's about is her son. She let me get hit and kicked in the stomach a lot and did not care. you guys just let them do A hate crime and racist attack. I am black and only 9 I am scared.
>
> 11/05/2025

### O. The Attack Was Preventable, Foreseeable, and the Direct Result of District Inaction

133. The October 28 assault did not come out of nowhere. It grew from a year of ignored racial harassment, documented violence, adult intimidation, and explicit warnings given to school staff at every stage. The attack was the product of:

    a.  no discipline after the September assault

    b.  no safety plan

    c.  no supervision increase

    d.  no staff warnings

    e.  no parent notification

    f.  no response to adult intimidation

    g.  no monitoring of recess

    h.  no action after a lunchroom threat

    i.  no seriousness given to racial slurs

    j.  no empathy for the child who reported fear

    k.  no implementation of required Title VI or anti bullying procedures

134. Every step the District failed to take created the conditions that allowed the attack to happen. Every failure compounded the next. The harm was not only predictable. It was predicted.

## CAUSES OF ACTION

### COUNT I
Title VI of the Civil Rights Act of 1964 - Racial Discrimination
*Against Defendant Board of Education and the District*

135. Plaintiffs restate and incorporate all prior allegations.

136. Defendant Board of Education and the District operate a public school system that receives Federal financial assistance within the meaning of Title VI, 42 U.S.C. § 2000d.

137. W.J. is a Black child and is a member of a protected class based on race.

138. While enrolled in Defendants school, W.J. was subjected to racial harassment and bullying by other students, including being called the n word, being called monkey, and other racist comments and conduct directed at his race.

139. The harassment also included physical and verbal bullying that was tied to his race and that targeted him as a Black child.

140. The racial harassment and bullying occurred repeatedly over time, in school buildings, on school grounds, and during school activities, and was known to school staff.

141. The nature, frequency, and duration of this harassment were so severe, pervasive, and objectively offensive that it created a hostile educational environment for W.J., caused him humiliation, fear, and emotional distress, and interfered with and limited his ability to benefit from and participate in the educational opportunities and services provided by the school.

142. Defendants had actual knowledge of the racial harassment and bullying. W.J. personally reported multiple incidents to school staff and administrators. His parent reported incidents and concerns. School officials were informed that he had been called the n word and monkey and that he was being targeted by peers.

143. In addition, staff members observed or were informed of student on student aggression toward W.J., and administrators were made aware of specific incidents through direct reports, meetings, and complaints.

144. Defendants Board of Education, Superintendent Koennecke, Principal Buell, and Chief Human Resources Officer Nichols, acting within their authority for the funding recipient, had actual knowledge of the reports of racial harassment and of the racially hostile environment faced by W.J.

145. Despite this actual knowledge, Defendants responded in a manner that was clearly unreasonable in light of the known circumstances.

146. Defendants failed to conduct prompt and adequate investigations into reports of racial harassment against W.J., failed to make written findings, and failed to determine whether racial harassment was verified.

147. Defendants refused or failed to discipline the students who used racial slurs against him, including students who called him the n word and monkey, and failed to take effective corrective action to stop the harassment or prevent it from recurring.

148. Defendants failed to follow their own written policies and procedures on bullying and harassment, which required prompt investigation, documentation, remedial action, and notification of parents and compliance officers when harassment based on a protected class was reported.

149. Defendants refused to notify his parent about certain incidents of harassment and refused to provide appropriate medical care and support after he was harmed, even though their own policies required parent notification and protective measures for victims.

150. Defendants forced the Black victim, W.J., to apologize to white aggressors, rather than disciplining the aggressors, which signaled that racist conduct toward him was tolerated and that he, rather than the aggressors, would be blamed and shamed.

151. Upon information and belief, Defendants treated complaints by white students about bullying more seriously than complaints by or about Black students, by investigating, disciplining aggressors, and notifying parents in cases involving white students, while failing to provide the same response for W.J.

152. Taken together, Defendants' actions and failures to act show deliberate indifference to known racial harassment. Defendants did not take steps reasonably calculated to end the harassment, to protect W.J. from further abuse, or to remedy the hostile environment.

153. Defendants' deliberate indifference allowed the racially hostile environment to continue and worsen. And caused W.J. to be denied the benefits of and excluded from full and equal participation in the educational programs and activities of the District because of his race.

154. As a direct and proximate result of Defendants Title VI violations, W.J. suffered emotional distress, humiliation, fear, and loss of educational opportunities, and Plaintiffs have suffered damages in an amount to be proven at trial.

155. Plaintiffs seek all remedies available under Title VI, including compensatory damages, declaratory and injunctive relief, and attorneys fees and costs.

## COUNT II
### 42 U.S.C. § 1983 - Substantive Due Process - State Created Danger
### *Board of Education, District, Koennecke, Buell, Nichols,*
### *Eigher, Hollis, Doe, and Strittmatter*

156. Plaintiffs restate all allegations.

157. The Due Process Clause of the Fourteenth Amendment protects W.J.'s fundamental right to be free from state actions that create or greatly increase the risk of private violence.

158. As alleged, W.J. suffered a violent group beating on school grounds during recess, as well as a prior violent ambush that involved choking and repeated blows to his head. He suffered a concussion, bruised ribs, bruised wrist, and serious emotional trauma.

159. Defendants knew of escalating threats and violence against W.J. for more than a year, including racial slurs, prior assaults, and direct warnings from his mother that the same group of boys posed an ongoing danger.

160. After the September 18 ambush, Principal Buell affirmatively told Eden that the school would not act, would not discipline the attackers, and would not implement safety measures, while still requiring W.J. to attend school with the same boys and without added supervision.

161. The District, through Buell, Eigher, and Nichols, affirmatively refused to discipline the attackers, refused to document the incident as a safety issue, and refused to warn teachers or staff, thereby returning W.J. to an environment where his known attackers had unrestricted access to him.

162. On October 28, school staff allowed an understaffed and poorly supervised recess with more than 100 students on the playground, despite specific warnings about these same boys and their prior violence. The lack of supervision was not a mere omission.

29

The District affirmatively scheduled and permitted this recess structure knowing the risk and without any targeted protections for W.J.

163. After the group assault on October 28, Strittmatter instructed W.J. to apologize instead of securing him, separating the aggressors, or calling for help. This forced apology shifted blame onto the victim and emboldened the aggressors.

164. Teacher Hollis, Jane Doe, Assistant Principal Eigher, and Counselor Kellett each received direct reports from W.J. that he had just been beaten, held, and kicked. Each affirmatively chose not to send him to the nurse, not to call 911, not to contact his mother, and not to remove the attackers from his vicinity. Instead, they returned him to class, placed him in isolation, and left the attackers in the general population.

165. These actions placed W.J. in greater danger than if Defendants had simply removed him from school or warned his mother and law enforcement. Before Defendants' actions, he faced the risk of peer bullying. After Defendants' actions and refusals to act, he faced a known and heightened risk of serious physical harm without protection, medical care, or parental involvement.

166. Defendants' conduct satisfies the state created danger doctrine. They committed affirmative acts that created or substantially increased a specific risk of serious harm to W.J. beyond the risk faced by the public at large, and they did so with deliberate indifference.

167. Defendants were aware of facts showing a substantial risk that W.J. would face further violent attacks by the same group of boys. Eden repeatedly warned that her son did not feel safe, that he feared additional attacks, and that racial hostility was present. Defendants received and understood these warnings.

168. Despite this knowledge, Defendants consciously disregarded the risk. They failed to discipline the aggressors, failed to separate them from W.J., failed to enforce safety policies, failed to increase supervision, and failed to provide medical or psychological support, while forcing W.J. to remain in the same environment.

169. Defendants' actions and omissions shock the conscience and violate substantive due process by exposing him to a foreseeable and preventable risk of serious physical harm.

170. As a direct and proximate result of these constitutional violations, Plaintiff suffered physical injury, emotional distress, trauma, fear, loss of educational access, and other damages in an amount to be proven at trial.

## COUNT III
### 42 U.S.C. § 1983 - Equal Protection
### Racial Discrimination (Disparate Impact) and Deliberate Indifference
### *Board of Education, District, Koennecke, Buell, Nichols*

171. Plaintiffs restate all prior allegations.

172. W.J. is a biracial Black child and a member of a protected class.

173. School officials received direct reports that he was subjected to racial harassment by other students. He was called monkey. These acts are racist on their face and create a hostile environment because of race.

174. He was then later attacked by the same aggressor who called him a monkey.

175. Despite this knowledge, Defendants failed to protect him, failed to discipline the offenders, and failed to stop the harassment from continuing.

176. Upon information and belief, white students who reported bullying had their complaints investigated as required by Board policy. White students who made reports

supported and their parents were notified. Their complaints were handled promptly and documented.

177. Upon information and belief, other students in the school have been disciplined for misconduct when the victim was white or when the situation did not involve a Black child. The school has shown in other cases that it knows how to complete investigations, notify parents, and impose discipline. It did not do so for W.J.

178. Instead, Defendants treated his complaints differently. They failed to document his reports, failed to conduct investigations, failed to notify his parent, and failed to discipline the offenders. This difference creates a strong inference of intentional discrimination.

179. Defendants forced the Black victim to apologize to the white aggressors. This shows discriminatory treatment because of race.

180. Defendants refused to notify his parent after he was targeted with racial harassment. They also failed to provide medical care after he suffered harm. The policies require notification of the parent of the victim when bullying is verified, but Defendants did not follow this requirement. (Exhibit A).

181. District Policy 5517.01 requires that all complaints about aggressive behavior be promptly investigated and that findings be documented in writing. The policy states that every incidence of bullying or harassment will result in prompt and appropriate disciplinary action and requires parent notification for both the victim and the perpetrator. Defendants did not follow any of these steps for W.J. (Exhibit A).

182. A plaintiff may prove an equal protection violation by showing different treatment of one class of students compared to another when they report harassment, or by showing deliberate indifference to discriminatory peer harassment.

183. Plaintiff meets both theories.

184. First, Defendants treated a Black child differently from white students who reported bullying. White students received investigations and parent contact. W.J. did not. Defendants made W.J. apologize for getting attacked.

185. Second, Defendants had repeated notice of racial harassment and responded with actions that were clearly unreasonable in light of the known circumstances.

186. The harassment suffered by W.J. was racial in nature. Defendants' failure to protect him, combined with their different treatment of white students, supports a finding of intentional discrimination based on race.

187. Because Defendants had repeated notice of racial harassment and failed to act in a reasonable or effective manner, Plaintiff states a valid Equal Protection violation under both disparate treatment and deliberate indifference theories.

**COUNT IV**
42 U.S.C. § 1983 - First Amendment Retaliation
*Board of Education, District, Koennecke, Buell, Nichols*

188. Plaintiffs restate all allegations.

189. Eden engaged in protected speech when she reported racial harassment, violent assaults, bullying, and repeated safety failures by the District.

190. Eden also engaged in protected speech when she asked that criminal charges be filed for the October 28 attack.

191. Eden also posted on Facebook regarding the District's inaction and asked for community involvement.

192. These reports involved matters of public concern, including school safety, racial discrimination, and compliance with mandatory reporting requirements.

193. The District responded with an adverse action. Hours after receiving her written report requesting charges, the District issued a no contact order restricting her ability to communicate with staff. (Exhibit B).

194. The no contact order prevented her from entering any school property.

195. The order prevents her from attending school board meetings that Ohio law requires to be open to the public. She cannot observe decisions that affect her son and daughter. She cannot speak during the public comment portion of the meetings. She cannot raise concerns, request accountability, or participate in the democratic process of school governance. These are rights that cannot be replaced or restored after the fact.

196. The directive also blocks her from basic parental involvement. She cannot communicate freely with staff about safety concerns. She cannot enter school buildings without advance permission. She cannot attend events for her daughter. She cannot meaningfully advocate for either child. These are daily harms. They separate a mother from essential parts of her children's lives.

197. The District has also threatened to involve the police if she enters school property for any purpose other than those they approve. This threat of criminal sanction chills her speech, intimidates her, and forces her to remain silent.

198. The harm is not hypothetical. It is ongoing. It affects her speech, her access to information, her ability to petition the government, and her ability to protect her children. These injuries cannot be undone by a later ruling. Once a school board meeting has passed, she can never again participate in that meeting. Once decisions are made without her voice, that opportunity is gone forever.

199. The timing shows that the order was issued because of her protected activity.

200. The order would deter a person of ordinary firmness from continuing to speak. It created fear of punishment and chilled her ability to advocate for her son.

201. Upon information and belief, the District has not imposed comparable restrictions on parents who did not criticize school conduct.

202. The adverse action was motivated by Eden's protected speech and was intended to silence her.

203. The retaliatory action was taken by the Superintendent, the Principal, and senior officials acting under color of state law and with final authority.

204. As a direct result, Eden suffered loss of rights, emotional distress, humiliation, and reputational harm.

205. Plaintiffs seek declaratory and injunctive relief, compensatory damages, nominal damages, punitive damages (individuals), and attorney fees under 42 U.S.C. § 1988.

**COUNT V**
42 U.S.C. § 1983 - Violation of the Fourteenth Amendment – Procedural Due Process
*Board of Education, District, Koennecke, Buell, Nichols*

206. Plaintiffs restate all allegations.

207. The Fourteenth Amendment prohibits the government from depriving any person of a protected liberty interest without notice and a meaningful opportunity to be heard.

208. Ohio law provides that school board meetings must be open to the public at all times. The public has a mandatory right to attend, observe, and participate in these meetings. A school district has no discretion to exclude members of the public based on viewpoint or past protected speech.

209. As the parent of two children enrolled in the Indian Hill Exempted Village School District, Eden has a recognized liberty interest in accessing school property for legitimate educational purposes, including attending school board meetings, attending school events, speaking during public comment, and communicating directly with school staff.

210. These rights have significant value. They allow a parent to obtain information, advocate for her children, and participate in the governance of the public school district that serves her family.

211. The District issued a written directive that bans Eden from school property, bars her from attending school board meetings, and restricts her in person communication with school staff to a single controlled channel.

212. The District issued this ban without providing her with advance notice.

213. The District did not provide her with the specific allegations that it relied upon when issuing the directive.

214. The District did not offer her an opportunity to respond, present evidence, or explain her position before the ban was imposed.

215. The District did not provide her with any hearing, appeal process, or neutral decision maker to review the directive.

216. The ban is indefinite. It contains no time limit, no date for reconsideration, and no standards for removal. This makes the deprivation permanent unless the District decides otherwise.

217. The ban severely restricts her liberty interests. She cannot attend school board meetings. She cannot attend school events involving her daughter. She cannot appear on

school property to raise concerns, observe meetings, or participate in matters that Ohio law requires to be open.

218. The District imposed these restrictions through unilateral administrative action, not through an adjudicatory process that meets constitutional requirements.

219. By issuing this sweeping and indefinite ban with no notice and no opportunity to be heard, Defendants deprived Eden of protected liberty interests in violation of the Fourteenth Amendment. Defendants acted under color of state law when issuing the directive, and their actions constitute an official act attributable to the District.

220. As a direct and foreseeable result, Eden suffered harm, including loss of access to public meetings, loss of the ability to advocate for her children, reputational damage, emotional distress, and ongoing exclusion from public educational spaces.

221. Plaintiff is entitled to declaratory relief, injunctive relief lifting the ban in its entirety, compensatory damages, punitive damages (individuals), and attorney fees under 42 U.S.C. § 1988.

## COUNT VI
### 42 U.S.C. § 1983 - Violation of the First Amendment
### Right to Petition and Right to Communicate with Government Officials
*Board of Education, District, Koennecke, Buell, Nichols*

222. Plaintiffs restate all allegations.

223. Eden has a protected right under the First Amendment to petition the government for redress of grievances.

224. She also has a protected right to communicate with school officials about the health, safety, and education of her child.

225. Defendants interfered with these rights when they issued a no contact order that barred her from contacting staff.

226. The order limited her ability to report concerns, request help, provide information, or advocate for her child's safety.

227. Eden would continue to communicate with school staff and petition the District for safety measures if she could do so without fear of punishment.

228. The no contact order was issued by high level officials acting as policymakers for the District. Their actions reflect official policy.

229. As a direct result, Eden lost her rights to petition and communicate, suffered emotional harm, and faced intimidation that chilled her speech.

230. Plaintiffs seek declaratory relief, injunctive relief, compensatory damages, punitive damages (individuals), and attorney fees under 42 U.S.C. § 1988.

### COUNT VII
*Monell* Liability
*Board of Education and District*

231. Plaintiffs restate all allegations.

232. The Board of Education and the District are liable under 42 U.S.C. § 1983 because the constitutional violations described in this Complaint were caused by official policies, customs, practices, and failures to train and supervise employees.

233. Upon information and belief, the District had a long-standing custom of ignoring racial harassment against Black students. Staff and administrators knew that W.J. had been called racial slurs in the prior school year and during the current year. They did not investigate, discipline, or take steps to prevent further harm.

234. Upon information and belief, the District had a custom of responding differently when white students reported bullying. White students received investigations, documentation, and parent notification. W.J. did not receive these protections. This pattern shows discriminatory treatment based on race.

235. Upon information and belief, the District had a custom of refusing to document violent incidents when the victim was a Black child. Incidents involving white victims were documented. Incidents involving W.J. were dismissed or ignored. This created a harmful environment that allowed escalating racial hostility.

236. Upon information and belief, the District had a custom of placing children back into unsafe environments after they reported harm. W.J. was returned to class immediately after being beaten by a group of boys. The aggressors were not separated. No protective steps were taken.

237. Upon information and belief, the District had a custom of failing to supervise high risk areas, including recess, despite prior warning that W.J. was in danger. The predictable danger then took place.

238. Upon information and belief, the District had a custom of not reporting violent conduct to law enforcement or child protective services, even when mandatory reporting laws applied under Ohio Rev. Code 2151.421. A group attack on a child was not reported. This was consistent with a broader pattern of internal handling of serious misconduct.

239. Upon information and belief, the District had a custom of discouraging or punishing parents who advocated for their children. When Eden sent a written request that charges be filed after the racial attack, the District issued a no contact directive against her only hours later.

240. The District had a custom of treating Eden's reports as an inconvenience rather than safety concerns. Administrators dismissed her warnings, minimized the racial nature of the violence, and refused to follow mandatory policies that required investigation and documentation of parent reports.

241. Upon information and belief, the District had a custom of silencing parents who questioned school decisions. The no contact order limited Eden's ability to advocate for her child, speak to staff, or report further incidents. This reflects an official practice that retaliated against protected speech.

242. The District had a custom of treating the Indian Hill Football Club as a school program when convenient but denying responsibility when violence occurred. The Club used District facilities, systems, and branding. Staff referred to the Club as part of the school. Yet the District claimed it could do nothing when a violent assault took place.

243. Superintendent Koennecke and Principal Buell had final policymaking authority over student safety, discipline, reporting, and the handling of harassment complaints. Their actions reflect official policy.

244. The District's customs, policies, and failures to train were the moving force behind the harm to both Plaintiffs. They caused violations of equal protection, substantive due process, and First Amendment rights. They also caused the denial of parental rights and the creation of a dangerous environment for W.J.

245. As a direct and proximate result of these unconstitutional policies and customs, Plaintiffs suffered injuries, damages, and losses.

### COUNT VIII
### Assault and Battery
*Minor Defendants (to be identified under seal)*

246. Plaintiffs restate all allegations.

247. Under Ohio law, a person commits assault when he or she intentionally causes another to fear an immediate harmful or offensive touching.

248. Under Ohio law, a person commits battery when he or she intentionally causes a harmful or offensive physical contact with another.

249. W.J. was a minor child who had a right to be free from attacks, violence, and unwanted physical contact while at school and during school affiliated activities.

250. MINOR 1 restrained his arms, and participated in coordinated violent conduct that caused W.J. fear and physical injury.

251. MINOR 2 intentionally grabbed W.J. by the neck, choked him, and participated in group violence meant to harm, intimidate, or injure W.J.

252. MINOR 3 intentionally targeted and threatened W.J. during lunch, pursued him during recess, and joined the coordinated attack that resulted in harmful contact and physical injuries.

253. MINOR 4 intentionally ran toward W.J., joined the group of children who chased him, and delivered physical blows, including a drop kick that caused pain and injury.

254. MINOR 5 intentionally participated in the group attack, including punching, kicking, and grabbing W.J. while he was attempting to escape.

255. MINOR 6 intentionally participated in the group attack, including punching, kicking, and grabbing W.J. while he was attempting to escape.

256. MINOR 7 intentionally participated in the group attack, including punching, kicking, and grabbing W.J. while he was attempting to escape.

257. Each of these actions was intentional, harmful, offensive, and performed without any consent from W.J.

258. The conduct by Minors 1 through 7 caused W.J. fear of immediate serious injury and caused actual physical harm, including a concussion, bruises, physical pain, and emotional trauma.

259. The attacks were coordinated, repeated, and done with the purpose of causing fear, humiliation, and physical harm.

260. Each Minor acted unlawfully, and each Minor is liable for assault and battery under Ohio law.

261. As a direct and foreseeable result of the assault and battery carried out by Minors 1 through 7, W.J. suffered physical injury, pain, emotional distress, medical costs, trauma, and ongoing fear.

262. Plaintiff, on behalf of W.J., seeks compensatory damages, punitive damages where permitted by law, and any further relief the Court finds just.

## COUNT IX
### Intentional Infliction of Emotional Distress
*Minor Defendants, Indian Hill Football Club, Coaches including Chris Bortz, Brian Currin, Sean McChesney, and Terrah Kocher*

263. Plaintiffs restate all allegations.

264. Under Ohio law, a defendant is liable for intentional infliction of emotional distress when the conduct is intentional or reckless, extreme and outrageous, and causes severe emotional harm.

265. Each Defendant engaged in conduct that independently and collectively meets this standard. Their actions were intentional or reckless, extreme and outrageous, and caused W.J. severe emotional harm.

266. In fall 2024, several minors repeatedly subjected W.J. to racial harassment, including calling him "monkey." All were white. Two were the sons of youth football coaches.

267. On September 18, 2025, MINOR 2 attacked W.J. after practice. MINOR 1 watched as the assault took place.

268. On October 28, 2025, MINOR 1, MINOR 3, MINOR 4, MINOR 5, MINOR 6, and MINOR 7 chased, surrounded, restrained, punched, kicked, and stomped W.J. during recess. They used racial slurs during the assault. One minor held W.J.'s arms behind his back so others could strike him.

269. These minors acted intentionally or with reckless disregard for the near certainty that their actions would cause severe emotional and physical harm.

270. The minors' actions were violent, targeted, hate motivated, and far beyond any bounds of decency tolerated in a civilized community.

271. After the September 18 attack, Minor 2's mother, Terrah Kocher, twice confronted W.J., a nine year old child, in aggressive and intimidating ways.

272. The day after the attack, Kocher approached W.J., blocked his space, forced him to stand and listen, and demanded that he apologize to the child who had slammed his head into the ground.

273. Later, Kocher again approached W.J. after practice. She stepped into his path so he could not pass, used a sharp and hostile tone, and accused him of retaliatory behavior.

274. Kocher's conduct was deliberate, threatening, and intended to shame and silence W.J. Her actions were not mistaken or impulsive. She sought him out twice, blocked his path, and asserted physical and verbal dominance over a traumatized child.

275. No reasonable adult would confront, accuse, or demand apologies from a battered child who had just been physically assaulted by her own son. Kocher's conduct was extreme, outrageous, and far beyond all bounds of decency.

276. Her actions caused W.J. fear, humiliation, and emotional suffering. He became afraid to attend school and practice and later expressed fear that returning could cost him his life.

277. Coach Bortz personally witnessed the September 18 attack. He imposed no meaningful discipline, issued no warnings, and took no steps to protect W.J.

278. Coach Currin and IHFC President McChesney were notified of the assault, the racial history, and the risk to W.J. They ignored these warnings and imposed no consequences.

279. Coaches Bortz and Currin continued allowing the aggressors to play, attend events, and interact freely with W.J. Their silence and inaction condoned the violence.

280. IHFC leadership then sent a mass email minimizing the attack, falsely claiming that "appropriate discipline was applied," and describing the violence as mere "scuffles." This was untrue and intended to excuse the attackers.

281. These adults acted with reckless disregard for the emotional and physical dangers they allowed to continue. Their actions empowered the minors and directly contributed to the escalation that resulted in the October 28 group attack.

282. IHFC had notice of the racial harassment in fall 2024 and took no meaningful action.IHFC failed to discipline aggressors, failed to implement any safety measures, and failed to investigate or intervene despite repeated warnings. IHFC leadership knowingly allowed racial hostility and violence to grow, demonstrating reckless disregard for W.J.'s emotional and physical safety.

283. Because of the above conduct, W.J. suffered severe emotional distress, including fear, panic, humiliation, withdrawal, and a belief that returning to school could result in his death.

284. The conduct of each defendant was a direct and proximate cause of W.J.'s emotional trauma.

## COUNT X
### Negligent Infliction of Emotional Distress
### *Indian Hill Football Club and Coaches*

285. Plaintiffs restate all allegations.

286. Defendants owed W.J. a duty to act with reasonable care in supervising youth football activities, responding to known threats, and ensuring a safe environment for minors placed in their charge.

287. Defendants knew or should have known that W.J. faced escalating danger based on repeated racial harassment, threats of violence, and the September 18, 2025 assault. These warnings made the risk of further harm foreseeable.

288. Despite this knowledge, Defendants failed to act reasonably.

289. They failed to investigate, failed to discipline aggressors, failed to supervise practices and recess, and failed to take basic protective steps that a reasonable adult would take when responsible for the safety of a nine year old child.

290. Defendants also allowed adult parent Terrah Kocher to twice confront and intimidate W.J. after the September attack, creating additional emotional harm and fear.

291. Due to these negligent acts and omissions, W.J. was placed in direct physical danger and suffered a violent group assault on October 28, 2025.

292. As a result, W.J. experienced serious emotional distress, including fear of death, trauma, anxiety, nightmares, and withdrawal from school activities.

293. The emotional harm was a foreseeable result of Defendants' negligence and occurred within the zone of physical danger created by their failure to act. Plaintiff seeks compensatory damages and all other relief the Court finds proper.

## COUNT XI
### Negligence
*Against Indian Hill Football Club, Coach Bortz, Coach Currin*

294. Plaintiffs restate all prior allegations.

295. Indian Hill Football Club, Coach Currin, and IHFC President Sean McChesney owed W.J. a duty of reasonable care to protect him from foreseeable harm during all football related activities, including practices, games, and associated team events. This duty included proper supervision, enforcement of safety rules, addressing violent behavior, and responding appropriately to reports of harassment and prior misconduct.

296. IHFC, through its leadership and coaches, also owed a duty to establish and enforce reasonable policies for player conduct, to intervene when dangerous behavior occurred, and to take corrective action when any player engaged in violence, bullying, or racially hostile behavior.

297. IHFC, Coach Currin, and President McChesney breached these duties by failing to supervise players adequately, failing to intervene during escalating misconduct, and failing to impose any discipline after repeated reports of racial harassment and the violent September 18 assault.

298. These defendants also breached their duties by minimizing the severity of the September assault, making misleading statements about "appropriate discipline," and allowing the aggressors to continue participating in football activities without consequence, despite clear indications that their behavior posed a danger to W.J.

299. IHFC leadership ignored multiple warnings from parents, dismissed the seriousness of the violence, and chose not to implement any meaningful safety measures, behavioral restrictions, or monitoring of the involved players.

300. It was reasonably foreseeable that IHFC's inaction and failure to supervise would embolden the aggressor players and result in further violence.

301. As a direct and proximate result of these defendants' negligence, W.J. suffered physical injury, emotional trauma, and ongoing psychological harm.

302. Plaintiffs are entitled to compensatory damages, including physical and emotional injuries, medical expenses, and all other relief available under Ohio law.

### COUNT XII
Violation of Ohio Rev. Code § 2307.44
*Against Indian Hill Football Club, President McChesney, Coach Bortz, Coach Currin, and Minor Defendants*

303. Plaintiffs restate and incorporate all prior allegations.

304. Ohio Rev. Code § 2307.44 creates a civil cause of action for any person who is subjected to hazing, as defined in division (A) of section 2903.31 of the Ohio Revised Code.

305. Under Ohio Rev. Code § 2903.31, "hazing" includes any act or coercive behavior related to initiation into, admission into, affiliation with, or continued membership in an organization of students that recklessly or intentionally causes mental or physical harm to another.

306. Indian Hill Football Club is an "organization" within the meaning of Ohio's hazing statutes. It is a club composed of student players enrolled in the District, using school facilities, the school mascot, and school-controlled systems for enrollment.

307. As alleged, players on the team used physical violence, threats, and intimidation against W.J.

308. The violence and threats were part of a pattern of targeting, isolating, and dominating black players, including W.J., as part of their affiliation with the team, which constitutes hazing under Ohio law.

309. The Minor Defendants who participated in the September 18 attack and related conduct recklessly and intentionally subjected W.J. to hazing that caused physical injuries, pain, and emotional distress.

310. Indian Hill Football Club, President McChesney, Coach Bortz, and Coach Currin were officers, leaders, and agents of the organization. They knew or should have known that players were engaging in dangerous and violent conduct aimed at W.J. as part of team culture.

311. Despite this knowledge, these Defendants authorized, requested, commanded, or tolerated hazing by failing to discipline the aggressors, by minimizing the attacks as "scuffles," by telling parents that the incidents were not criminal, and by allowing the aggressors to continue playing without meaningful consequence.

312. Under Ohio Rev. Code § 2307.44, actions may be brought not only against participants in the hazing, but also against any organization whose officers authorized, requested, commanded, or tolerated the hazing, and against those officers themselves.

313. As a direct and proximate result of Defendants' hazing, W.J. suffered physical injuries, including head trauma and pain, as well as emotional distress, fear, humiliation, and loss of educational and athletic opportunities.

314. Plaintiffs seek compensatory damages, mental and physical pain and suffering, exemplary damages where permitted, and all other relief available under Ohio Rev. Code § 2307.44.

## COUNT XIII
### Violation of Ohio Rev. Code § 2151.421
### Failure to Report Child Abuse
*Against Principal Buell, Assistant Principal Eigher, Teacher Hollis, Teacher Jane Doe,*
*Teacher Strittmatter, Chief Human Resources Officer Nichols*

315. Plaintiffs restate and incorporate all prior allegations.

316. Ohio Rev. Code § 2151.421 requires certain mandatory reporters, including school teachers, school employees, and school authorities, to immediately report to a public children services agency or law enforcement when they know or have reasonable cause to suspect that a child under eighteen has suffered any physical or mental wound, injury, disability, or condition that reasonably indicates abuse or neglect.

317. At all relevant times, Defendants Buell, Eigher, Hollis, Jane Doe, Strittmatter, and Nichols were "school teachers," "school employees," or "school authorities" within the meaning of Ohio Rev. Code § 2151.421.

318. On and after October 28, these Defendants knew or had reasonable cause to suspect that W.J. had suffered serious physical and mental injury that reasonably indicated abuse. They knew or were told that a group of students had surrounded him, restrained his arms, beaten him, kicked him in the ribs and stomach, stomped on his head, and chased him while using racial slurs.

319. These Defendants also saw or had access to evidence of his injuries, including his visible distress, his repeated reports throughout the school day that he had been attacked, and the later medical confirmation of concussion and other injuries.

320. The pattern of violence, threats, and racial harassment against W.J., together with the group beating and his written statement that he feared he would be killed if he returned, met the statutory threshold for suspected abuse that must be reported.

321. Despite this, none of these Defendants made an immediate report to the public children services agency or to law enforcement as required by § 2151.421. They chose instead to handle the matter internally, to minimize it, and to keep his mother and outside authorities in the dark for hours.

322. Under Ohio law, a mandatory reporter who fails to make a required report is subject to criminal penalties and is also civilly liable for compensatory and exemplary damages to the child who would have been the subject of the report.

323. Had Defendants complied with their mandatory reporting duty, public authorities could have investigated, intervened, and implemented safety and support measures for W.J. and his family.

324. Defendants' failure to report deprived W.J. of the protections that Ohio law provides to abused or endangered children and allowed the pattern of racial harassment and violence to remain hidden and unaddressed.

325. As a direct and proximate result of Defendants' violation of Ohio Rev. Code § 2151.421, W.J. suffered additional emotional distress, trauma, fear, and loss of trust in adults, along with the ongoing risk of further harm.

326. Plaintiffs seek compensatory and exemplary damages under Ohio Rev. Code § 2151.421 and § 2151.99, together with costs and any other relief the Court deems just.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and against all Defendants, and award the following relief:

a. A declaration that Defendants violated Plaintiffs rights under the United States Constitution and federal law, including Title Six, the Equal Protection Clause, the Due Process Clause, and 42 U.S.C. § 1983;

b. A declaration that Defendants actions, omissions, customs, and policies created or increased the danger to W.J. and resulted in violations of his substantive due process right to bodily integrity;

c. A declaration that Defendants maintained unconstitutional customs, practices, and policies and are liable under *Monell;*

d. A declaration that Defendants violated W.J.'s rights under Ohio Rev. Code § 2307.44 (Hazing Civil Liability);

e. Nominal damages;

f. A permanent injunction;

g. Compensatory damages in an amount to be proven at trial;

h. Punitive damages against all individual Defendants for their reckless and callous disregard of Plaintiffs federally protected rights;

i. Statutory damages, civil penalties, and any other relief authorized under Title Six, the Equal Protection Clause, the Due Process Clause, § 1983, and Ohio law.

j. Prejudgment and post judgment interest as allowed by law;

k. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute; and

l. Such other and further relief as this Court deems just, fair, and proper.

Respectfully submitted,

**_/s/ Robert Thompson_**
Robert Thompson, Esq. (0098126)
THOMPSON LEGAL, LLC
250 E 5th St., 15th Floor
Cincinnati, Ohio 45202
P: 513-780-5985
F: 513-780-5988
robert@rthompsonlegal.com

*Attorney for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

**_/s/ Robert Thompson_**
Robert Thompson, Esq. (0098126)

**Appendix A**
*Minor Identification Chart*

| MINOR | Initials |
|---|---|
| MINOR 1 | T.B. |
| MINOR 2 | L.K. |
| MINOR 3 | A.L. |
| MINOR 4 | E.L. |
| MINOR 5 | T. |
| MINOR 6 | C.D. |
| MINOR 7 | R.S. |

## VERIFICATION

I, **Eden Castleberry Cook**, declare under penalty of perjury that I am the Plaintiff in this action and the parent and legal guardian of W.J. I have read the Complaint in this matter. The facts stated in it relate to my own knowledge or to the personal knowledge of W.J. are true and correct to the best of my knowledge, information, and belief. The facts stated on information and belief I believe to be true. I understand that providing false information in this Verification may subject me to penalties for perjury.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 19th day of November 2025.


**Eden Castleberry Cook**
Plaintiff and Parent of W.J.



NOTARY ACKNOWLEDGMENT

State of Ohio                )
County of Hamilton )

On this 19th day of November, 2025, before me, the undersigned Notary Public, personally appeared **Eden Castleberry Cook** known to me or proven to me through satisfactory evidence of identity, and she acknowledged that she executed the foregoing Verification freely and voluntarily for the purposes stated in it.


IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

Austin J. Cummings
State of Ohio
Notary Public
My commission exp. 11/02/30

Notary Public
My Commission Expires: 11/02/30