## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Eden Castleberry Cook, *et al.*, | : | |
| Plaintiffs, | : | Case No. 1:25-cv-848 |
| v. | : | Judge Susan J. Dlott |
| Indian Hill Exempted Village School District, *et al.*, | : | **Order Granting Motion to Dismiss and Denying Motion for Judgment on the Pleadings** |
| Defendants. | : | |

This matter is before the Court on the Motion to Dismiss filed by Defendants Indian Hill Football Club ("IHFC"), Christopher N. Bortz, Brian Currin, and Sean McChesney (Doc. 18) and Motion for Judgment on the Pleadings filed by Defendant Terrah M. Kocher.  (Doc. 22.) Both Motions are opposed, and Defendants replied.  (Docs. 25–28.)  For the reasons set forth herein, the Court will **GRANT** the Motion to Dismiss (Doc. 18) and **DENY** the Motion for Judgment on the Pleadings.  (Doc. 22.)

## I.      BACKGROUND

### A.      Procedural History and Complaint Allegations[1]

On November 19, 2025, Plaintiffs Eden Castleberry Cook and her minor son, W.J., who is a black student at Indian Hill Elementary School ("IHES"), filed this action against the following Defendants:

- Indian Hill Exempted Village School District ("IHSD") and its Superintendent, Kirk Koennecke, and Chief Human Resources and Operations Officer, Jim Nichols;
- Board of Education of the Indian Hill Exempted Village School District ("IHSB");

---

[1] The Complaint allegations are accepted as true for purposes of the Motion to Dismiss and Motion for Judgment on the Pleadings.  *DIRECTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007).

- Indian Hill Elementary School's ("IHES's") Principal, Whitney Buell; Assistant Principal, Nate Eigher; staff members, Courtney Strittmatter and Jonathan Hollis; and Behavior Specialist, Jane Doe;
- Indian Hill Football Club ("IHFC"); its President, Sean McChesney; football coach, Christopher N. Bortz; and assistant football coach, Brian Currin; and
- Minors 1–7[2] and Minor 4's parent, Terrah M. Kocher.

(Doc. 1 at PageID 5–8.)

Plaintiff alleges that in fall of 2024, W.J. was subjected to repeated racial harassment at IHES.  (*Id*. at PageID 9.)  Three white children, including Minor 1, repeatedly called W.J. "monkey."  (*Id*.)  W.J. reported this to his mother and the IHES Principal at the time, Cash Hayden.  (*Id*.)  Plaintiff alleges that IHSD arranged a speaker to talk to the children about differences and did not issue discipline.  (*Id*. at PageID 9–10.)

W.J. was a member of  a football team affiliated with the IHFC.  (*Id*. at PageID 10–11.) He was the only black player on his team.  (*Id*. at PageID 11.)  Plaintiff alleges the IHFC used the same school name, mascot, colors, and branding as the IHSD and enrollment for the team occurred through the same online system as academic registration.  (*Id*. at PageID 10–11.)  IHFC operated during school sponsored pep rallies, homecoming events, and assemblies.  (*Id*.) Families believed the program was school sponsored because it functioned like a school team. (*Id*.)  IHFC operated on school property.   (*Id*.)

On September 18, 2025, when practice ended, Minor 2 and Minor 8, who were white fourth graders, assaulted W.J.  (*Id*.)   The Complaint alleges:

---

[2] The Minors have yet to be served.

> W.J. casually threw a ball. Without warning, MINOR 2 charged at full speed and slammed him to the ground. While W.J. lay dazed and unprotected, MINOR 8 seized his head with both hands and repeatedly smashed his skull into the ground up to a dozen times. . . . MINOR 2 placed both hands around W.J.'s neck and strangled him while he was pinned to the ground.

(*Id*. at PageID 11–12.) Castleberry Cook reported the incident the following day, September 19, 2025, to Principal Buell, who stated that the incident occurred after school and was outside of the school's responsibility. (*Id*. at PageID 12.)

Castleberry Cook alleges that both the head coach and assistant coach were aware of the assault, and one of them had personally witnessed it. (*Id*. at PageID 14.) Plaintiff approached Bortz and Currin, who told her they would handle the situation. (*Id*.) Meanwhile, McChesney "pushed responsibility back down the chain of command, onto coaches who had already refused to act." (*Id*. at PageID 15.) On October 3, 2025, one of the coaches emailed the team's families stating that the incident involved "scuffles" and did not warrant removal from the team. (*Id*.) The email stated that the actions were not criminal and appropriate discipline was applied. (*Id*.)

On September 19, the day after the assault, Defendant Kocher, the mother of Minor 2, allegedly confronted W.J. while he was standing alone. Kocher "walked straight up to him, stepped into his personal space, and spoke to him with authority as if he had done something wrong." (*Id*.) According to the Complaint: "She told him to stand there and listen while she explained why her son had attacked him. . . . she told [him] to apologize [to her son]." (*Id*. at PageID 15–16.)

After another football practice, W.J. was walking when Kocher allegedly "stepped into his path and blocked him so he could not move forward." (*Id*. at PageID 16.) Using a "sharp

3

and hostile tone" she "accused him of tackling her son 'too hard' during a normal practice play" and claimed that this was "retaliation for the violent assault" by her son.  (*Id*.)  Kocher's actions created fear and intimidation and made W.J. feel unsafe.  (*Id*.)

Castleberry Cook met with administrators who told her that the school could not discipline the aggressors because the attack occurred after practice.  (*Id*. at PageID 16.)  Plaintiff asked for "vigilance" and to watch for danger, be alert, and intervene if needed.  (*Id*. at PageID 17.)  However, administrators told Castleberry Cook that no consequences would be issued and no concrete actions would be taken.  (*Id.*)

On October 28, 2025, Minor 3 approached W.J. at lunch and asked him several times, "Are you really ready for recess?"  (*Id*.)  Plaintiff alleges this was said in an intimidating tone. (*Id*.)  When recess began, Minors 1, 3, 4, 5, 6, and 7, white students, surrounded W.J.  (*Id*. at PageID 18.)  Some of the boys had been involved in earlier hostility, and others were part of the same peer group.  (*Id*.)  Several of the boys were football players.  (*Id*.)  According to the Complaint, the boys moved in a coordinated group and one boy yelled, "Catch him."  (*Id*.)  W.J. attempted to run, but the boys caught him.  (*Id*.)

At least one boy held W.J.'s arms behind his back, restraining him so the others could strike him repeatedly.  (*Id*. at PageID 19.)  The children hit or kicked his face, stomach, and ribs. (*Id*.)  W.J. was able to free himself and ran to the jungle gym area of the playground.  (*Id*.)  The children caught up to him, and Minor 1 grabbed W.J.'s arms and held them behind his back. (*Id*.)  Minor 4 drop kicked him and stopped on his head.  (*Id*.)  Other children "closed in around

4

him, shouting, kicking, and hitting." (*Id.*) One child took W.J.'s shoe and threw it. (*Id.* at PageID 20.)

> The Complaint alleges:
>
> While held from behind with his arms forced back, W.J. was hit in the face, punched in the ribs, and kicked in the stomach. His head was stomped into the ground. In the middle of this, he heard racial slurs. He heard the word 'f****ing n*****r' screamed at him while they struck him.

(*Id.*) After escaping the attack, W.J. ran to the nearest adult, Ms. Strittmatter, to beg for help and report the attack. (*Id.* at PageID 21.) She told W.J. to apologize to the child she believed was the victim (Minor 4). (*Id.*) When he returned to class, W.J. told his teacher, Mr. Hollis, what happened, but he ignored the issue. (*Id.*) W.J. also told behavior specialist Ms. Doe, but she did not take any action. (*Id.*)

Assistant Principal Eigher spoke to W.J. about the incident but minimized what happened and did not take any safety steps. (*Id.* at PageID 22.) W.J. was sent to the school counselor, Ms. Kellett, and after he explained what happened, she failed to send him to the nurse or ensure medical attention was administered. (*Id.*) W.J. was placed in an isolation room. (*Id.*) The school called W.J.'s mother several hours after the incident. (*Id.*) Castleberry Cook was told that he had been taken to the nurse and there were no issues. (*Id.* at PageID 23.) However, when speaking to W.J. later that evening, Castleberry Cook discovered that W.J. was never taken to the nurse at all. (*Id.*) Castleberry Cook took W.J. to the hospital, where he was diagnosed with a concussion, bruised ribs, a bruised wrist, and significant emotional shock. (*Id.*)

5

On October 30, Castleberry Cook sent a written request asking IHSD to press charges. (*Id*. at PageID 24.)  The IHSD issued a no contact order against Castleberry Cook hours later. (*Id*.)  W.J. does not feel safe at school.  (*Id*.)   He is "scared" and worried he "will die" if he goes back to school.  (*Id*.)

**B.     Procedural History**

Castleberry Cook filed this lawsuit on behalf of herself and her son, W.J., on November 19, 2025 asserting thirteen claims, primarily directed at the IHSD, IHSB and administration response to the October 28, 2025 assault.  (Doc. 1.)  For purposes of the pending motions, however, only four claims at issue are:

> Count 9: intentional infliction of emotional distress against Minors 1–7; IHFC, Bortz, Currin, McChesney, and Kocher;
> Count 10: negligent infliction of emotional distress by IHFC, Bortz, and Currin;
> Count 11: negligence against IHFC, Bortz, and Currin; and
> Count 12: violation of Ohio Rev. Code § 2307.44 (civil hazing) against IHFC, McChesney, Bortz, Currin, and Minors 1–7.

(*Id*. at PageID 26–50.)  On January 23, 2026, IHFC, McChesney, Bortz, and Currin moved to dismiss the four claims pending against them (Counts 9, 10, 11, and 12).  (Doc. 18.)  Plaintiffs responded in opposition on March 16, 2026, and IHFC, McChesney, Bortz, and Currin filed a reply on March 30, 2026.  (Docs. 26, 28.)  On February 2, 2026, Kocher moved for judgment on the pleadings on the claim of intentional infliction of emotional distress pending against her. (Doc. 22.)  On March 16, 2026, Plaintiffs responded in opposition, and on March 19, 2026, Kocher replied.  (Docs. 25, 27.)  For the reasons set forth herein, the Court will **GRANT** the Motion to Dismiss (Doc. 18) and **DENY** the Motion for Judgment on the Pleadings.  (Doc. 22.)

6

## II.     STANDARD OF REVIEW

### A.  Motion to Dismiss

IHFC, McChesney, Bortz, and Currin move to dismiss the claims against them for failure to state a claim under Rule 12(b)(6).  A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  This, however, requires "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  Under the standard set forth in *Twombly* and *Iqbal*, "courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020). "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Id.*

In deciding a motion to dismiss, the district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DIRECTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.

2007). In doing so, the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby Cnty.,* 220 F.3d 433, 446 (6th Cir. 2000).

### B. Motion for Judgment on the Pleadings

Kocher moves for judgment on the pleadings under Rule 12(c). The legal standard for adjudicating a Rule 12(c) motion is the same as that for adjudicating a Rule 12(b)(6) motion. *Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (citation omitted). The district court may only consider the pleadings when ruling on a Rule 12(c) motion, but the pleadings include documents attached to an answer if it is "central to the plaintiff's claim and of undisputed authenticity." *Beasley v. Wells Fargo Bank, N.A.*, No. 3:17-CV-00726, 2017 WL 3387046, at *3 (M.D. Tenn. Aug. 7, 2017), *aff'd sub nom.*, 744 F. App'x 906 (6th Cir. 2018).

### III. LAW AND ANALYSIS

### A. Motion to Dismiss

The Court first turns to the Motion to Dismiss filed by IHFC, Bortz, Currin, and McChesney. IHFC, Bortz, Currin, and McChesney argue that all claims fail on the merits, and that the claims against the three individual volunteers for the IHFC would be barred by state and federal immunity statutes. The Court will first address the merits of the claims. Because all claims fail on the merits, the Court will not delve into the issue of immunity.

8

### 1. Intentional Infliction of Emotional Distress

A plaintiff must plead the following four elements to state a claim for intentional infliction of emotional distress claim under Ohio law:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
> (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community;
> (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and
> (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,* 947 F.3d 342, 353 (6th Cir. 2020) (citing *Burkes v. Stidham*, 107 Ohio App.3d 363, 668 N.E.2d 982, 989 (1995)).  The resulting distress must be severe enough that a reasonable person could not be expected to cope with it.  *Paugh v. Hanks*, 451 N.E.2d 759, 765 (1983).  For conduct to be sufficiently outrageous, it must meet a high threshold:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.,* 6 Ohio St. 3d 369, 375, 453 N.E.2d 666, 671 (1983), *abrogated on other grounds by Welling v. Weinfeld*, 113 Ohio St. 3d 464, 866 N.E.2d 1051 (2007).

9

Plaintiffs' claim hinges the theory that the football coaches' response to the September 18, 2025 attack at the end of practice rises to such a severe and outrageous response it amounts to intentional infliction of emotional distress.  Plaintiffs do not allege that the coaches engaged in harassing behavior, yelled obscenities, encouraged violence, or perpetuated the behavior.  Rather, Plaintiffs highlight the following alleged facts in support of their claim that the Defendants acted in an extreme and outrageous way.  W.J. was nine years old, and students at IHES "repeatedly called him 'monkey'" as a racial slur in the fall of 2024.  (Doc. 1 at PageID 5, 9–10.)  Plaintiffs generally allege IHFC had notice of the fall racial slur.  (*Id*. at PageID 44.)  Plaintiffs allege that one of the coaches witnessed the September 18, 2025 assault, and both were "aware" of the assault.  (*Id*. at PageID 14.)

Plaintiffs are troubled by what they view Bortz, Currin, McChesney and the IHFC did not do rather than what they did do, more akin to a negligence claim.  According to Plaintiff, after the September 18, 2025 incident, the coaches and President of the IHFC did not separate W.J. from the aggressors, did not impose meaningful discipline or create protections, and did not take appropriate remedial action when it sent a message to team families describing the incident as "scuffles."  (*See* Doc. 26 at PageID 194; Doc. 1 at PageID 14–15.)  Plaintiffs allege that as a result of this inaction, the minors involved were empowered and the issue escalated to the point of the October 2025 assault on the school playground.  (Doc. 1 at PageID 44.)

Defendants move to dismiss on the basis that the alleged conduct does not rise to an extreme and outrageous level.  Plaintiffs argue the facts as pled constitute extreme and

outrageous conduct, because the coach, assistant coach, and President of the IHFC were in positions of power or had apparent authority and knew W.J. was especially vulnerable to harm. Plaintiffs have not come forward with any analogous Sixth Circuit or Ohio law cases to support their position and instead rely upon factually distinguishable, non-controlling authority from the District of Columbia and Illinois. *See Doe v. District of Columbia*, 151 F.4th 435 (D.C. Cir. 2025); *McGrath v. Fahey*, 126 Ill. 2d 78, 533 N.E.2d 806 (1988).

In *Doe*, the D.C. Circuit Court of Appeals found that an intentional infliction of emotional distress claim by a student, Doe, against a school principal arising under D.C. law survived summary judgment because a reasonable jury could conclude that the principal's conduct was extreme and outrageous. 151 F.4th at 452. There, the principal took extensive steps to undermine Doe despite corroborating video evidence, including by expressing her opinion to subordinates that the report of assault was "bullshit;" that she intended to "embarrass [Doe's] ass"; lying to the superintendent about the contents of the corroborating video; and withholding pertinent information. 151 F.4th at 452–53. Further, the Court weighed that the principal was responsible for Doe's safety and as a victim of sexual assault, she was extraordinarily vulnerable, which could profoundly affect the outrageousness calculation. *Id*. at 453. In *McGrath*, the conduct giving rise to the intentional infliction of emotional distress claim was a scheme by bank officials in a position of trust to defraud the plaintiff and his colleague out of millions of dollars. 533 N.E.2d at 811–13. After inducing plaintiff to sell realty under circumstances in which the ability ever to be fully paid for the property was jeopardized, defendants engaged in conduct "very much akin to extortion" including: refusing to release

11

funds, refusing to permit plaintiff to transfer funds in a checking and money market account, refusing to honor drafts drawn on accounts, and contacting plaintiff about a dispute while he was home recuperating from heart surgery. *Id*. at 812.

The facts alleged in this case are not analogous. Plaintiffs do not allege that Bortz, Currin, McChesney, or the IHFC abused their positions of trust as coaches or President of the IHFC, by, for instance, falsifying information, making disparaging comments, withholding assets, or harassing the victim while home recovering from a serious medical condition. Rather, under Ohio law, "a mere failure by school officials to act to stop student-to-student harassment is, as a matter of law, not the extreme and outrageous conduct required to sustain an IIED claim." *Peterson v. Kramer*, No. 3:13-cv-187, 2016 WL 680828, at *15 (S.D. Ohio Feb. 18, 2016); *Anoai v. Milford Exempted Sch. Dist.*, No. 1:10-cv-44, 2011 WL 53164, at *9 (S.D. Ohio Jan. 6, 2011). The Court finds that the facts alleged do support Plaintiffs' claim for intentional infliction of emotional distress against these four Defendants.

### 2. Negligent Infliction of Emotional Distress

Plaintiffs bring a negligent infliction of emotional distress claim against Bortz, Currin, and IHFC. A negligent infliction of emotional distress action under Ohio law requires the plaintiff to demonstrate that: (1) the plaintiff was a bystander, or was personally subject to peril; (2) the plaintiff reasonably appreciated the peril which took place, whether or not the victim actually suffered physical harm; and (3) the plaintiff suffered serious emotional distress because of this cognizable fear of peril. *Cline v. Tecumseh Loc. Bd. of Ed.*, No. 2020-CA-36, 2021-Ohio-1329, ¶¶ 24 (citing *Boesdorfer v. Travis*, No. 91-CA-98, 1992 WL 317459, at *1 (Ohio Ct. App.

12

Nov. 5, 1992)); *Heiner v. Moretuzzo,* 73 Ohio St.3d 80, 86–87, 652 N.E.2d 664, 669 (1995).  A negligent infliction of emotional distress claim applies when the defendant's negligence places the plaintiff in immediate risk of physical peril or where the plaintiff witnesses a dangerous occurrence causing such peril.  *Heiner*, 652 N.E.2d at 669–70.  The Supreme Court of Ohio has held that Ohio law does not recognize the right of a plaintiff to maintain a cause of action for negligent infliction of emotional distress where the defendant's negligence produced no actual threat of physical harm to the plaintiff or any other person.  *Id.*

Defendants assert that Plaintiffs' negligent infliction of emotional distress claim fails because Ohio law recognizes this claim only under fact-specific circumstances involving a defendant-created risk of immediate physical harm.  Upon review of the allegations, the Complaint lacks facts demonstrating that Bortz, Currin, and IHFC placed W.J. in a zone of danger.  The Complaint alleges that W.J. experienced physical danger when he was assaulted after football practice on September 18, 2025 by Minors 2 and 8 while Minor 1 and Bortz stood nearby.  (Doc. 1 at PageID 11–12.)  The Complaint alleges that Castleberry Cook "notified school leadership" which included Principal Buell.  (*Id*. at PageID 12.)  However, Principal Buell responded that because the incident occurred after school, the school would not act and was not responsible.  (*Id*.)  Therefore, the school district did not take any steps to separate the alleged aggressors from W.J. at school.  (*Id*. at PageID 12–14) ("The result was that the same group of children remained free to approach, threaten, and harm W.J. during the school day with no meaningful adult intervention.")  One of the minors who attacked W.J. "was allowed to participate fully" in the school homecoming event.  (*Id*. at PageID 14.)  The Complaint does not

allege that the IHFC or its coaches had any involvement in determining who could participate in homecoming or other school-related activities.

Plaintiffs allege that the IHFC "minimized what happened and allowed the aggressors to continue without consequence." (*Id*.) Coach Bortz and Assistant Coach Currin told W.J.'s mother they would "handle it," but "not a single meaningful action followed." (*Id*.) McChesney "claimed he could do nothing" and "pushed responsibility back down the chain of command." (*Id*. at PageID 15.) Therefore, "Eden removed W.J. from the football team for his protection."[3] (*Id*.)

On October 3, Bortz sent an email to the team's families about the incident, stating that "the physical nature of the game and the boys' competitive spirit can sometimes lead to scuffles, which may escalate." (Doc. 1-4 at PageID 73.) The email stated that the football club tailors discipline to the individual and severity of the incident and closely monitors interactions and strives to understand "both sides" of a conflict before acting. (*Id*.) Bortz conveyed that any players who create an unsafe environment will be removed from the team. (*Id*.) The email further stated:

> Last week's incidents involved serious missteps, but none warranted removal or were "criminal" in nature. Appropriate discipline was applied, and we're ready to move forward and finish the season strong. Please remind your sons to treat teammates with respect, report mistreatment to a coach, and avoid retaliation. Your support is key!

(*Id*. at PageID 74.)

---

[3] It is unclear from the Complaint when W.J. stopped playing football on the IHFC team.

14

W.J.'s mother continued to ask the IHSD, including Principal Buell and Assistant Principal Eigher, for protection for her son, but it took no action.  (Doc. 1 at PageID 17.) Plaintiffs allege the "District had now been warned about racial slurs in 2024, had been warned about the September 18 assault, had been warned about adult intimidation, and had been warned again on October 2" but refused to intervene.  (*Id.*)

On October 28, 2025, at school, Minors 1, 3, 4, 5, 6, 7 assaulted W.J. on the playground. (*Id.* at PageID 17–19.)  The Complaint alleges, "Some of these boys had been involved in the earlier hostility, and others were part of the same peer group that had targeted him before. Several were football players."  (*Id.* at PageID 18.)  Plaintiffs allege that several school teachers did not respond properly to the attack or take sufficient steps to prevent it from happening.  (*Id.* at PageID 19–23.)

The Complaint does not allege that Bortz, Currin, or IHFC created danger and placed W.J. in a zone of danger.  Rather, it alleges that the other children who assaulted W.J. and IHSD created a danger when the children assaulted W.J. at the playground a month after the September 18, 2025 incident.  The Complaint alleges that Bortz, Currin, and IHFC did not properly handle the September 18, 2025 incident by how they chose to address it, but that is not enough to support this claim.  Plaintiffs do not cite any facts that Bortz, Currin, or the IHFC controlled supervision at IHES.  As Defendants assert, this tort does not reach speculative future risks arising from independent third-party conduct in settings the relevant Defendants did not control or supervise.  Further, the Court notes that different aggressors were involved in the separate assaults.  The facts alleged do not support this claim under Ohio law.  As such, it is dismissed.

15

### 3. Negligence

Plaintiffs assert that IHFC, Bortz, and Currin were negligent when they breached their duty of reasonable care to protect W.J. from foreseeable harm during all football related activities and to establish and enforce player conduct by failing to supervise, intervene, and impose discipline after "repeated reports of racial harassment and the violent September 18 assault." (Doc. 1 at PageID 46.)   Plaintiffs' response brief makes clear, however, that this claim is not about making volunteer coaches guarantors of child safety at every hour of the day.  (Doc. 26 a PageID 200.)  Rather, they frame, or narrow, this as an issue of "adults who ran a youth football program, knew a nine-year-old child in that program had just been violently attacked, had authority to respond, and then chose not to take basic protective steps." (*Id*.)  Based upon the allegation of the Complaint and Plaintiffs' response in opposition to the Motion to Dismiss, this claim is focused upon whether these Defendants were negligent in responding to the September 18, 2025 assault after football practice.

A plaintiff states an Ohio negligence claim by alleging: (1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach.  *Wallace v. Ohio Dep't of Com.,* 96 Ohio St. 3d 266, 274, 773 N.E.2d 1018, 1025–26 (2002) (citing *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270 (1989)).  "The duty element of negligence, with which courts have linked the public-duty rule, is a question of law for the court to determine." *Id*. at 274, 1026.

As with the negligent infliction of emotional distress claim, the Complaint alleges that the October 28, 2025 assault occurred during school recess and under school supervision.  There are

no facts alleged in the Complaint that either football coach or the IHFC President had authority to supervise school recess or control student interactions during school hours.  Under Ohio law, liability for the criminal acts of third parties requires foreseeability and a degree of control over the premises or environment in which the harm occurs.  *See Simpson v. Big Bear Stores Co.*, 73 Ohio St. 3d 130, 134–35, 652 N.E.2d 702, 705 (1995) (discussing foreseeability; no duty by shopkeeper to protect invitees from criminal acts of third parties on premises not in the possession and control of the business owner; relying upon 2 Restatement of the Law 2d, Torts (1965) 116, 122, Sections 314–315)).

As Plaintiffs point out, in *Cameron v. University of Toledo*, an Ohio Court of Appeals found that the university football team's coaches owed a duty to a student who filed a negligence complaint after he was horribly injured, suffering brain damage, while participating in a freshman Olympics event with the school football team, at which one of the coaches was present. *See Cameron v. Univ. of Toledo*, 98 N.E3d 305, 310, 324–25 (Ohio Ct. App. 2018).  In assessing whether a duty of care arose, the Court applied Ohio law, which is that "the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Id*. at 323 (citing *Wallace*, 773 N.E.2d at 1025–26). The existence of duty may also be established by common  law, legislative enactment, or the particular circumstances of a case.  *Id*.  Observing the limited case law establishing a common law duty of care owed by coaches to players, the Court extended one in *Cameron* given the circumstances of the case, including the contractual duty to protect student athletes present in the

17

coaches' contracts, a common-law duty between a coach and student athletes under same or similar circumstances, and the foreseeability of harm suffered by Cameron.

Here, Plaintiffs allege Bortz, Currin, and IHFC were negligent in responding to an after practice assault, which resulted in an October 28, 2025 assault at recess supervised by the IHSD. No coach was present at the October 28, 2025 assault as was the case in *Cameron*.  The minors involved were different children than those involved in the September 18, 2025 assault.  They were not acting under the supervision or direction of the coaches.  This is an entirely dissimilar factual circumstance and far too attenuated from the foreseeability that was present in the *Cameron* case.

This case is distinguishable, as Plaintiffs allege that the coaches owed a duty to prevent criminal harm by third parties a month after an incident after practice occurred.  As Defendants point out, coaching youth sports or running a youth sports program does not create a generalized duty to supervise a participant at all times and in all settings.  Plaintiffs do not allege facts that demonstrate Bortz, Currin, and McChesney knew or should have known that a separate assault would occur at school with different minors weeks after the assault that occurred on September 18, 2025 such that a duty arose to prevent that harm.

There are no allegations demonstrating that Bortz, Currin, or the IHFC, through McChesney, owed a duty of care to prevent an assault at IHES on October 28, 2025 under the facts as alleged.  As such, this claim must be dismissed.

18

### 4. Civil Hazing

Plaintiffs assert a civil hazing claim against IHFC, McChesney, Bortz, Currin, and the Minor Defendants.  Under Ohio Rev. Code § 2307.44, "[a]ny person who is subjected to hazing, as defined in division (A) of section 2903.31 of the Revised Code, may commence a civil action for injury or damages, including mental and physical pain and suffering, that result from the hazing."  Ohio Rev. Code § 2307.44.  Under the referenced Ohio Rev. Code § 2903.31, hazing is defined as:

> doing any act or coercing another, including the victim, to do any act of initiation into any student or other organization or any act to continue or reinstate membership in or affiliation with any student or other organization that causes or creates a substantial risk of causing mental or physical harm to any person, including coercing another to consume alcohol or a drug of abuse, as defined in section 3719.011 of the Revised Code.

Ohio Rev. Code § 2903.31.  "Inherent in this definition is a student's desire to join the student organization, and perhaps a willingness to consent to the hazing out of that desire to join." *Golden v. Milford Exempted Village Sch. Dist. Bd. of Educ.*, No. CA2010-11-092, 2011 WL 4916588, at *4 (Ohio Ct. App. Oct. 17, 2011).  In *Golden*, the court found a series of disturbing acts of bullying did not amount to civil hazing under Ohio law.  *Id.* at *5.  In making this distinction, the court found that the acts were not designed to initiate boys onto a team or organization, but were instead habitual acts of aggression toward other boys; further, statements indicated that other members of the team did not sanction the acts nor were they on behalf of the team or any part of an initiation process.  *Id.*  The record also demonstrated that the victims did not consent to the acts against them or feel they were necessary to be initiated onto the basketball team.  *Id.* at *6.

19

Like *Golden*, the facts as alleged do not support a civil hazing claim under Ohio law, which recognizes a distinction between bullying and hazing.  There are no allegations that the football coaches or President of the IHFC coerced any act of initiation in any way or that the alleged conduct was on behalf of the football team.  The allegations describe misconduct among boys, and different boys were involved in the two assaults alleged.  This claim fails as a matter of law.  Plaintiffs have not sufficiently alleged a civil hazing claim under Ohio law against Defendants Currin, Bortz, McChesney, or IHFC.

As Plaintiffs fail to state a claim reasons, Defendants' Motion to Dismiss is **GRANTED**.[4]

## B.     Motion for Judgment on the Pleadings

Defendant Kocher moves to dismiss the single claim of intentional infliction of emotional distress pending against her.[5]  As Kocher argues, only the most extreme and outrageous conduct qualifies, as it must be intolerable and beyond the bounds of decency to be actionable.  *Yeager*,

---

[4] Because the Court ruled upon the claims on the merits, it will not address the parties' arguments that immunity under Ohio and federal law applies pursuant to Ohio Rev. Code  § 1702.55 (Liability of members, directors, and officers of corporation); 42 U.S.C. § 14501 (Volunteer Protection Act); Ohio Rev. Code § 2305.38 (Uncompensated volunteers of nonprofit charitable organizations no liability).

[5] As discussed *supra*, the elements of this claim under Ohio law are:

(1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
(2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community;
(3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and
(4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.,* 947 F.3d 342, 353 (6th Cir. 2020) (citing *Burkes v. Stidham*, 107 Ohio App.3d 363, 668 N.E.2d 982, 989 (Ohio 1995)).

453 N.E.2d at 671.  Kocher argues that the alleged facts do not meet this exacting standard, as the Complaint essentially alleges that Kocher gave W.J. "a proverbial 'piece of her mind' about the incident in which she perceived that W.J. was the aggressor toward her own child."  (Doc. 22 at PageID 173.)  She also asserts that the alleged emotional distress is not sufficiently severe enough, as the Complaint alleges that her actions caused only fear, humiliation and emotional suffering, not that the emotional distress was debilitating.

Kocher alleges that although there is little in the way of comparable cases, an Illinois case dismissing an intentional infliction of emotional distress claim supports her position that the conduct alleged does not rise to the high standard to be sufficiently outrageous.  *Taylor v. Wal-Mart Stores, Inc.*, No. 09-cv-0942, 2010 U.S. Dist. LEXIS 2289, at *6 (S.D. Ill. Jan. 12, 2010). In *Taylor*, an employee alleged that Wal-Mart should have known of a patron's mental condition and acted with malice and in a threatening manner by accusing the patron of stealing a coat and causing great emotional distress.  Although a "close call," the court found that the complaint failed to demonstrate emotional distress by the patron and that the tort did not extend to insults, indignities, threats, annoyances, and petty oppressions.  *Id*. at *6–7.  Kocher also relies upon *Wilson v. Columbus Bd. of Educ.*, 589 F. Supp. 2d 952 (S.D. Ohio 2008), in which the court dismissed an intentional infliction of emotional distress claim under Ohio law where the Court found no reasonable jury could find that the defendant assistant principal's conduct was extreme and outrageous and beyond all reasonable bounds of decency at the summary judgment stage. *Id*. at 971.  There, the assistant principal placed the plaintiff in an abusive home while suspended from school and allegedly read an incident report while in the presence of the plaintiff and the

21

alleged abuser, with no forethought as to the possible danger created by the disclosure.  *Id*.  The Court found that although the assistant principal may have exercised poor judgment, she did not act atrociously or do anything utterly intolerable in a civilized society.  *Id*.  This case involved very different facts and a more advanced procedural posture.

The Court finds that at the pleading stage, the allegations against Kocher are sufficient to state a plausible claim for intentional infliction of emotional distress.  The Complaint alleges that Kocher verbally reprimanded W.J. the day after he was attacked by her son, stood in his personal space, and told him to apologize to her son who had assaulted him.  (Doc. 1 at PageID 15–16.) She did this again after another football practice by stepping into his path, blocking him from moving, using a sharp and hostile tone and accusing W.J. of tackling her son too hard claiming it was retaliation for the assault by her son.  (*Id*.)  Plaintiffs claim that Kocher's actions created fear and intimidation and made him feel unsafe.  (*Id*.)  Other allegations within the Complaint demonstrate the consequences to W.J.'s mental health may be severe, including the fact that he does not feel safe enough to return to school.  (*Id*. at PageID 24.)  Although not a particularly strong claim at the pleading stage, it is plausible and can proceed at this juncture.

Accordingly, Kocher's Motion for Judgment on the Pleadings (Doc. 22) is **DENIED**.

## IV.    CONCLUSION

For the reasons stated, the Court **GRANTS** the Motion to Dismiss filed by Bortz, Currin, McChesney, and IHFC (Doc. 18) and **DENIES** the Motion for Judgment on the Pleadings filed by Kocher.  (Doc. 22.)

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge

23